UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| v. ) | Cause No. 2:22-CR-065-PPS-JEM |
| TYWOUN DESHAWN NIXON, ) | |
| Defendant. ) | |

## OPINION AND ORDER

On July 20, 2022, Defendant Tywoun Nixon was indicted on a charge of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). [DE 1.] Nixon seeks the suppression of evidence obtained through a warrantless search of his vehicle during a traffic stop—namely, a Taurus Millennium Pro 9mm semi-automatic handgun and ammunition located in a locked glove box on the passenger side of the car. [DE 30.]

I held an evidentiary hearing on the motion, at which Officer Jesus Solis of the Merillville Police Department appeared and provided testimony on behalf of the government. [DE 40; DE 41.] I subsequently reviewed the officer's body camera footage from the traffic stop, which the government submitted as an exhibit at the evidentiary hearing. [*See* DE 41, Gov't Exh. 1.] After reviewing the evidence presented, I find that Nixon voluntarily gave consent for Officer Solis to search his vehicle, including the glove compartment, and he did not revoke his consent, so the search was lawful. Therefore, the motion will be denied.

**Background**

On October 14, 2021, Officer Solis conducted a traffic stop on a red Nissan in Merrillville, Indiana. Officer Solis completed a report following the stop and also testified at the evidentiary hearing.[1] [DE 30-1; DE 40.] He wore a body camera during the stop, and the footage has been tendered to the Court on a disc dated February 13, 2024.[2] The relevant facts are not in dispute. As explained below, the parties' disagreements really boil down to competing interpretations of certain statements Nixon made to Officer Solis during the traffic stop.

While on patrol, Officer Solis observed that the Nissan had a paper license plate that was hard to read and damaged, causing it to appear "blurred." He performed a registration check that revealed the license plate had expired two months earlier. [DE 30-1 at 1–2.] He activated his overhead emergency lights and stopped the car. After approaching the passenger side of the vehicle, he spoke with Tywoun Nixon, the driver, who was accompanied in the vehicle by Kiera Williams and two young children. [*Id.*; Govt Exh. 1 at 0:45.] Nixon told him that the Nissan was his vehicle and that he had

---

[1] There is no official transcript from the hearing and my distillation of the relevant testimony is based on a rough transcript.

[2] Throughout this Opinion and Order, I will refer to the docket citation reflecting the government's tendered exhibit at the evidentiary hearing [DE 41, Gov't Exh. 1], with citations to the relevant time stamps in the video. The video is a little over 38 minutes long. Nixon's counsel relied on portions of the video tendered by the government at the evidentiary hearing and he does not appear to contest the accuracy of the camera footage. For completeness, I'll note that Nixon separately filed a USB drive containing several excerpts from the camera footage, all of which appear in the full version tendered by the government. [*See* DE 33.]

2

picked Williams and her children up on the way back to his house in Gary after wrapping up work in Chicago. [Gov't. Exh. 1 at 1:30–1:42.]

At the evidentiary hearing, neither defense counsel nor counsel for the government knew whether Nixon (as opposed to Williams) actually owned the Nissan in question. Officer Solis testified that Nixon's name appeared on documentation he received for the car after he performed the traffic stop. Nixon provided Officer Solis an Indiana ID card and confirmed that he was driving on a suspended driver's license. [DE 30-1 at 2–3; Gov't Exh. 1 at 2:30–3:05.] Officer Solis asked Nixon and Williams if there were any weapons in the vehicle, and Williams responded "no." Initially, Nixon did not reply, but when asked again he also responded "no." [Gov't Exh. 1 at 3:12–3:23.]

Officer Solis performed a check on the information provided by Nixon and Williams, determined that Nixon had an active warrant for his arrest in Gary City Court, and called for assistance from an additional unit. [DE 30-1 at 3.] He returned to the car and asked Nixon to step out of the vehicle, and Nixon complied with the request. [Gov't Exh. 1 at 10:10–10:30.] Officer Solis proceeded to explain that he was going to permit Williams to drive the vehicle "due to the fact that he had his (2) young children in the back seat," and that Nixon would not be taken to jail pursuant to the active warrant for his arrest. [DE 30-1 at 3; *see* Gov't Exh. 1 at 10:35–11:15.] Officer Solis then asked Nixon if he could search the vehicle. Nixon consented to a search of the vehicle in the following exchange:

3

>**Officer Solis:** Do you mind if we just take a look and make sure there's nothing else illegal in the car? I really don't wanna tow the car because your kids are in the back, ya know.
>
>**Nixon:** No.
>
>**Officer Solis:** What?
>
>**Nixon:** Go ahead.

[Gov't Exh. 1 at 11:15–11:28.] A review of the video makes it clear that both times he responded to Officer Solis' question, Nixon was gesturing in the direction of the car, indicating that he assented to the request to search. *Id.*

Before Officer Solis performed the search, Nixon requested the keys to the car, stating that Williams would need them to drive home. Both of the adults were out of the vehicle at that point, with the children remaining in the backseat. Officer Solis explained that when the officers were finished searching the car, he would provide Williams with the keys, which Nixon had left in the car on a keychain with many other keys. *Id.* at 11:45–12:15; *see id.* at 13:18. Officer Solis then conducted a search of the vehicle, starting on the driver's side. He opened the center console and observed "fresh marijuana 'buds' sitting at the bottom of the console," and "(1) loose 9mm Luger ammunition bullet that was sitting in the tray under the radio player." [DE 30-1 at 3.] He also attempted to open the glove box. It appears that Williams had opened the glove box at the outset of the stop, while she and Nixon were still in the vehicle, in order to retrieve Nixon's paperwork – but when Officer Solis attempted to open it during the search, he found that it was "suddenly" locked. *Id.*

4

Officer Solis exited the vehicle and asked Nixon, "Where are the keys to the car, boss?" He had located a "set" of keys in the car, but it wasn't clear which one started the ignition or opened the glove box. Nixon responded that the keys should be somewhere in the vehicle, but did not specify which key on the chain opened the glove box. Officer Solis continued the search for the keys, but to no avail. [Gov't Exh. 1 at 15:00–17:15.]

All of which leads us to the important exchange between Nixon and Officer Solis:

**Officer Solis:** Okay, so where the keys at, boss? 'Cause here's the problem, alright. Now you're gonna make me impound the car. Okay? So where the keys at?

**Nixon:** How am I making you impound the car?

**Officer Solis:** Because you're driving on a suspended license. I really don't want to do that to you and your kids, alright?

**Williams:** [inaudible] . . . they gotta be in the car.

**Officer Solis:** So I found the set of keys that you gave her to initially unlock the, the box, right. . . . Now there's no keys on here. Okay. So let's not play games, alright?

**Nixon:** What are you talking about?

**Officer Solis:** The key fob to this car, along with the key that unlocks the glove box, right?

**Nixon:** Right.

**Officer Solis:** Okay. Where's that at?

**Nixon:** Why are you trying to unlock my glove box?

**Officer Solis:** It's a question.

**Nixon:** You can tow the car, though, if you['re] gonna do it like that then.

5

> **Officer Solis:** You want me to impound – you really want me to leave your girl out here like that, with your kids?

Officer Solis then asked Williams if she had the key to the glove box in her purse or jacket, and she said she didn't have the key. Williams asked for her phone. Officer Solis retrieved it from the car. He told Williams, "[Y]ou don't have to call for a ride just yet. . . . Give me a minute." *Id.* at 17:16–18:43.

A couple minutes later, Officer Solis again spoke to Nixon. This time he asked, "You don't have any idea where it's [the key is] at?" Nixon responded that the key is "*in* there," and the officers needed to "look in the middle for it." [Gov't Exh. 1 at 21:38–22:30 (emphasis added).] Officer Solis went back to the car and located a bullet under the radio in front of the middle console. Officer Solis asked Nixon directly, "Are you a convicted felon?" Nixon replied, "Yeah." Officer Solis then informed Nixon that he had located a bullet and marijuana buds in the vehicle. *Id.* at 21:38–23:30.

Officer Solis proceeded to speak with Williams one-on-one near a squad car. He told her what he had found in the car, reminded her that her kids were in the backseat, and observed that it was "cold out here." *Id.* at 23:38–23:48. Williams confirmed she had unlocked the glove box to get the paperwork. She said she gave the keys back to Nixon, didn't know where he put the key, and that she did not see any gun in the car. *Id.* at 24:00–25:15. Officer Solis got the keychain and showed it to Williams. She was able to identify the key to unlock the glove box. *Id.* at 25:35. He then returned to the car, unlocked the glove box, and identified a black handgun in the compartment. [*Id.* at 26:00, 26:50; DE 30-1 at 4.] Nixon was then placed under arrest. [Gov't Exh. 1 at 26:15;

6

DE 30-1 at 4.] Officer Solis retrieved the handgun from the vehicle and observed it had a "magazine of 12 matching 9mm [L]uger bullets like the loose one that was located under the radio." [DE 30-1 at 4–5.] Williams was permitted to drive the car from the scene. [DE 30-1 at 6.]

Officer Solis testified that he understood Nixon voluntarily consented to the search of his vehicle by saying "go ahead" as he gestured toward the vehicle. As noted, during the stop, he located loose ammunition and marijuana buds and observed a strong odor of burnt marijuana emanating from the center console. Asked why he searched the car, Officer Solis said that it was a common practice to ask for permission to search during a traffic stop; and in this case, Nixon had consented to a search of the vehicle. He stated that after the initial search, he asked Nixon if he was a convicted felon, which Nixon confirmed was the case.

Officer Solis further testified that the car's license plate was expired, and that driving on expired plates violated Indiana law. But he added that whether to impound the vehicle in that situation is a matter of officer discretion: Williams (who had a valid driver's license) could have driven the vehicle from the scene if Officer Solis "decided to go that way." Officer Solis testified that if he was not able to search locked areas of the car where he reasonably believed contraband may be located, he would not have allowed Williams to drive the car home; but because he was able to search the glove box, he permitted her to drive the car home rather than impound it. He further stated

7

that in many other cases he had allowed other motorists with expired plates to drive away without impounding their vehicles.

During cross-examination, defense counsel played excerpts of the body camera footage and suggested that Officer Solis had told Nixon that he would tow the car if he did not consent to a search. Officer Solis pushed back on that characterization, noting that he said he "really didn't want to" tow the car, but came short of stating that he *would* tow the vehicle if Nixon did not consent to a search.

## Discussion

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. To conduct a "search" under the Fourth Amendment, an officer generally must obtain a warrant supported by probable cause. *See Katz v. United States*, 389 U.S. 347, 359 (1967). Where a search or seizure was effected without a warrant, "the prosecution bears the burden of establishing legality," *United States v. Longmire*, 761 F.2d 411, 417 (7th Cir. 1985), and must do so by a preponderance of the evidence, *see United States v. Matlock*, 415 U.S. 164, 178 n.14 (1974).

Consent is one well-recognized exception to the Fourth Amendment's warrant requirement. *United States v. Jones*, 22 F.4th 667, 675 (7th Cir. 2022) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)). Whether a defendant provided consent voluntarily

8

is a question of fact that must be evaluated in light of the "totality of the circumstances." *Id.* (citing *United States v. Thurman*, 889 F.3d 356, 367 (7th Cir. 2018)*; United States v. Thompson*, 842 F.3d 1002, 1009 (7th Cir. 2016)). In this circuit, "totality of the circumstances" boils down to a number of factors courts must consider in evaluating the voluntariness of consent, including: "(1) the age, education, and intelligence of the defendant; (2) whether he was advised of his constitutional rights; (3) how long he was detained before consenting; (4) whether he consented immediately or was prompted by repeated requests; (5) whether physical coercion was used; [] (6) whether he was in custody when he consented," and (7) the "individual's 'experience with the criminal justice system.'" *Thurman*, 889 F.3d at 367; *United States v. Clinton*, 591 F.3d 968, 972 (7th Cir. 2010). It's the government's burden to show that consent was "freely and voluntarily given." *Jones*, 22 F.4th at 676 (citing *Bumper v. North Carolina*, 391 U.S. 543, 548 (1968)).

Initially, the government notes that Nixon was 25 years of age at the time of the alleged offense and he graduated high school in 2014. [DE 17.] A review of the video shows that Nixon appeared appropriately responsive and lucid during his encounter with Officer Solis. The first factor weighs in favor of voluntariness. While Nixon was not advised of his right to refuse consent or that his consent did not need to be in writing, the Supreme Court has explained that this is not required to make consent voluntary under the totality of the circumstances. *See Bustamonte*, 412 U.S. at 227 ("While knowledge of the right to refuse consent is one factor to be taken into account,

9

the government need not establish such knowledge as the sine qua non of an effective consent."); *Jones*, 22 F.4th at 676 & n.2.

As to the third factor, the body camera footage reflects that Nixon provided initial consent to search approximately eleven minutes after being pulled over. In a similar case, the circuit found the defendant's consent voluntary when it was provided twenty minutes after the defendant was taken into custody, which strongly suggests that the period of detention in this case does not render Nixon's consent involuntary. *See United States v. Strache*, 202 F.3d 980, 986 (7th Cir. 2000). In any case, for the vast majority of the time between when Officer Solis stopped the vehicle and Nixon consented to the search, Nixon and Williams remained in the vehicle and the officer was on his computer checking their information; they hardly interacted before Nixon consented to the search of the vehicle. That timeline dovetails with the fourth factor – here, Nixon consented immediately upon Officer Solis' first request for permission to search. Moreover, there was no physical coercion evident in the body camera footage, nor do the parties suggest that Officer Solis confronted Nixon or otherwise physically coerced him to induce consent.

The balance of factors also support the conclusion that Nixon gave voluntary consent to search the vehicle. Nixon was not in custody at the time he provided consent to search the car. *United States v. Khan*, 937 F.3d 1042, 1053 (7th Cir. 2019) (internal citation omitted) ("[T]he temporary and relatively nonthreatening detention involved a traffic stop or *Terry* stop does not constitute *Miranda* custody."). Finally, Nixon has a

10

remarkably long criminal history for his age, including eight criminal convictions or adjudications, indicating a familiarity with the criminal justice system that reinforces a finding that he understood he could have refused to consent to a search of his vehicle in the absence of a warrant. [*See* DE 17.] In light of the relevant factors, I have no doubt that Nixon freely and voluntarily consented to the search of the vehicle.

The key questions in this case concern the scope of Nixon's consent and whether he later revoked it. Nixon tells me that the scope of his consent to search the car excluded locked compartments, such as the glove box. [DE 30 at 3.] But there is no evidence that Nixon limited his consent to search everywhere in the car except the glove compartment. If he did not want officers to search the glove box, he could have said so. But he did not.

The Seventh Circuit has explained that whether a search "remains within the scope of consent is a question of fact to be determined from the totality of all the circumstances." *United States v. Saucedo*, 688 F.3d 863, 865 (7th Cir. 2012) (citing *United States v. Jackson*, 598 F.3d 340, 346–48 (7th Cir. 2010)). I must evaluate the scope of Nixon's consent by asking "what the typical reasonable person would have understood by the exchange between the law enforcement agent and the person who gives consent." *Jackson*, 598 F.3d at 348.

While the scope of a search is "generally defined by its expressed object" (here, to search 'the car'), "[a] reasonable person may be expected to know that [contraband is] generally carried in some form of a container," since "[c]ontraband goods rarely are

11

strewn across the trunk or floor of a [vehicle]." *See Florida v. Jimeno*, 500 U.S. 248, 251–52 (1991) (criminal suspect's right to be free from unreasonable searches not violated when, after suspect gave police offer permission to search automobile for drugs, officer opened folded paper bag on car's floorboard that might reasonably contain drugs). Once an individual consents to "a general search, law enforcement may search anywhere within the general area where the sought-after item could be concealed." *Jackson*, 598 F.3d at 348–49. *Accord Jimeno*, 500 U.S. at 252 (rejecting argument "that if the police wish to search closed containers within a car they must separately request permission to search each container," because there is "no basis for adding this sort of superstructure to the Fourth Amendment's basic test of objective reasonableness").

In the context of a search for illegal drugs, for example, the Seventh Circuit has indicated that "consent permits law enforcement to search inside compartments and containers within the car, so long as the compartment or container can be opened without causing damage." *United States v. Calvo–Saucedo*, 409 F. App'x 21, 24 (7th Cir. 2011). And in the analogous context of sealed containers contained within larger objects like luggage, the circuit has likewise held that consent to search luggage "validates the search both of the luggage and of containers within the luggage." *United States v. Dyer*, 784 F.2d 812, 814, 816 (7th Cir. 1986). In *Dyer*, the court explained that "where a suspect does not withdraw his valid consent to a search for illegal substances before they are discovered, the consent remains valid and the substances are admissible as evidence," and affirmed the district court's finding that the defendant had consented to the search

12

of a white box containing cocaine – even though the defendant had only expressly consented to a search of the sealed cardboard box in which the white box was located. *Id.* at 816 (citing *United States v. Black*, 675 F.2d 129 (7th Cir. 1982)). *See also United States v. Morgan*, 725 F.2d 56, 58 (7th Cir. 1984).

The video provided to the Court substantially supports the conclusion that Nixon did not expressly limit the scope of his consent by saying that Officer Solis could not search the glove box. Before performing the search, Officer Solis twice asked Nixon if there were any weapons in the vehicle – it seems perfectly clear that Nixon understood that Officer Solis was searching for firearms. In the course of the search, Officer Solis located marijuana buds and a loose bullet in the cabin of the vehicle, and he smelled marijuana in the car. He observed Williams open the glove box to retrieve Nixon's paperwork (which Williams confirmed she did), but after he was given permission to search, the glove box was "suddenly" locked. He informed Nixon that he had located a bullet and marijuana in the vehicle and asked whether Nixon was a convicted felon, which Nixon confirmed was the case.

When asked where the key to the glove box was located, Nixon repeatedly told Officer Solis that it was somewhere inside the car, indicating that he had no problem with him finding the key and unlocking the compartment as part of the search. *Cf. Saucedo*, 688 F.3d at 866 (where officer asked suspect if he had any weapons or drugs in his truck or trailer and suspect gave consent to search "without any express limitation," the scope of consent extended to "inside compartments in the tractor-trailer, including

13

the sleeper area, where drugs could be concealed," including a "hidden compartment" where "one could reasonably think might, and in fact did, contain drugs").

What's more, after Nixon initially gave consent to search the vehicle, Officer Solis was under no obligation to separately request permission to search "each container" in the car. *See Jimeno*, 500 U.S. at 252. Ultimately, Officer Solis opened the glove box without causing damage to the car. *See Calvo-Saucedo*, 409 F. App'x at 24 ("[C]onsent permits law enforcement to search inside compartments and containers within the car, so long as the compartment or container can be opened without causing damage."). All of this suggests that a reasonable person in Officer Solis' position would have understood that a search of the glove box remained within the scope of Nixon's consent to search.

As the circuit observed in *Dyer*, there is an embedded issue in the analysis: whether Nixon had "withdraw[n] his valid consent to a search for [contraband] before [it was] discovered" by Officer Solis. *See* 784 F.2d at 816. If Nixon withdrew consent to search before the glove box was opened, the fruits of the search are inadmissible. This rule derives from the notion that a suspect's consent must "reasonably be understood" to extend to the challenged search. *Jimeno*, 500 U.S. at 252. "If a suspect's attempt to withdraw consent is equivocal, 'police officers may reasonably continue their search in the premises entered pursuant to the initial grant of authority.'" *Jones*, 22 F.4th at 679 (quoting *United States v. $304,980.00 in U.S. Currency*, 732 F.3d 812, 820 (7th Cir. 2013)); *see id.* at 679 n.4 ("[C]onsenters should clearly indicate the scope or withdrawal of

14

consent."). Ultimately, the burden is on a suspect to clearly indicate the scope or withdrawal of consent. *See United States v. Thurman*, 889 F.3d 356, 368 (7th Cir. 2018) (citing *United States v. Patterson*, 97 F.3d 192, 195 (7th Cir. 1996)).

Nixon points to his colloquy with Officer Solis (highlighted above), in which he was asked where the key to the glove box was located, responded by asking why Officer Solis was trying to unlock the glove box, and added that officers could "tow the car, though, if you['re] gonna do it like that then." [Gov't Exh. 1 at 11:15–11:28.] Nixon asserts that Officer Solis presented him with an ultimatum: "(1) permit the search; or (2) have the vehicle towed," and that his statement, "You can tow the car, though," unequivocally limited the scope of consent or withdrew consent to search the glove box. [DE 30 at 3.] There is some evidence supporting the conclusion that Officer Solis understood Nixon's initial statement, "You can tow the car," to constitute a revocation of consent to search the glove box, insofar as he told Williams not to call for a ride and pressed Nixon about whether he wanted to leave his "girl out here like that" with her children.

But it's not so clear cut. Nixon's initial statement did not clearly and unambiguously revoke consent to search the glove box. Asked where the key was located, he said something Officer Solis already knew – which is that he *could* tow the vehicle from the scene at his discretion because Nixon was driving with expired plates. As the government points out, minutes after making this statement, Nixon reiterated that the key to the glove box was in the car and Nixon told Officer Solis to check the

15

center console, where he apparently believed he would find the key. [*See* Gov't Exh. 1 at 21:38–22:30.] After Nixon directed him to the keychain, Officer Solis was able to identify the key in question by speaking to Williams. At no point in this process did Nixon protest Officer Solis' dogged pursuit of the key to the glove box – rather, after suggesting Officer Solis could tow the car if he wanted to do so, Nixon directed him to the very keychain that contained the key in question. In sum, it was Nixon's burden to unequivocally revoke or limit the scope of consent; and in this case, the evidence does not support the conclusion that he clearly revoked his consent to the search.

The government makes an additional argument that, even assuming Nixon revoked his consent, the evidence is still admissible because Officer Solis had probable cause to search the vehicle before Nixon withdrew consent. [DE 35 at 15.] Even if it were the case that Nixon clearly limited or revoked his consent, I find this argument persuasive. In the context of this traffic stop, a search of the glove box was supported by probable cause that marijuana would be located in the locked compartment of the vehicle.

Nixon initially consented to a search of his car. Officer Solis discovered loose marijuana buds in the center console and observed a strong smell of marijuana in the cabin of the vehicle. He also observed Williams open the glove box prior to exiting the vehicle. But when he went to open it during the search, it was locked; and Nixon was evasive about where exactly the key to open the glove box had gone in the meantime. While Officer Solis testified that he did not smell marijuana emanating from the glove

16

box, in particular, courts have held that "the smell of marijuana smoke 'would give the police probable cause to search the passenger compartment for drugs,'" as well as "separate containers or the trunk of the car." *United States v. Kizart*, 967 F.3d 693, 697 (7th Cir. 2020) (quoting *United States v. Franklin*, 547 F.3d 726 (7th Cir. 2008)). Nixon did not file a reply brief to address this alternative argument, which appears to be supported by the facts in the record.

Finally, the parties dispute application of the inevitable discovery doctrine, pursuant to which "illegally obtained evidence that is normally suppressed under the exclusionary rule may be admitted if it would have been discovered even without the unlawful police activity." *United States v. Fialk*, 5 F.3d 250, 252 (7th Cir. 1993) (citing *Nix v. Williams*, 467 U.S. 431, 444 (1984)). [*See* DE 30 at 5–6; DE 35 at 17–19.] In light of the foregoing findings, I do not need to reach this question.

**ACCORDINGLY:**

Defendant Tywoun Deshawn Nixon's Motion to Exclude [DE 30] is **DENIED**.

**SO ORDERED**.

ENTERED: April 16, 2024.

                                       /s/ Philip P. Simon
                                       PHILIP P. SIMON, JUDGE
                                       UNITED STATES DISTRICT COURT